J-A13019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                :                  PENNSYLVANIA
                :
       v.              :
                :
                :
CRYSTAL  QUINONES          :
                :
        Appellant     :   No. 2661 EDA 2015

Appeal from the Judgment of Sentence July 10, 2015
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s):  CP-39-CR-0003123-2014

BEFORE:   LAZARUS, J., OTT, J. and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:           **FILED SEPTEMBER 26, 2017**

Crystal Quinones appeals from the judgment of sentence imposed July 10, 2015, in the Lehigh County Court of Common Pleas.  The trial court sentenced Quinones to an aggregate term of eight and one-half to 17 years' imprisonment, following her jury conviction of two counts of aggravated assault and one count of endangering the welfare of a child ("EWOC"),[1] for injuries she inflicted on her four-month-old daughter, N.C.  Quinones raises four arguments on appeal: (1) the Commonwealth breached a pretrial agreement to proceed only on a charge of EWOC; (2) the evidence was insufficient to support her convictions of aggravated assault; (3) the trial

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a)(8), and (a)(9), and 4304.

court erred in prohibiting her from presenting evidence of her good character; and (4) the sentence imposed was manifestly excessive. For the reasons below, we affirm.

The evidence presented during Quinones's jury trial is summarized by the trial court as follows:

> [O]n January 24, 2014, [Quinones] dropped off her four (4) month old baby daughter, [N.C.],[4] at Maria Bermudez's apartment.[5] Ms. Bermudez is a day care provider who provides day care services out of her residence located in center city Allentown. On this morning, [N.C.] was sleeping when she arrived at the day care facility. [N.C.] was buckled in her car seat, still wearing her hat and winter coat. Prior to leaving, [Quinones] instructed Ms. Bermudez to keep an eye on [N.C.]'s arm because it was sore. Later that morning, [Quinones] called Ms. Bermudez to inquire about [N.C.] As [N.C.] was still sleeping, Ms. Bermudez removed the baby from the car seat and began to take off [N.C.]'s coat. Ms. Bermudez immediately noticed that something was wrong. [N.C.] screamed and her arm went limp. Ms. Bermudez advised [Quinones] over the telephone that the baby needed to be taken immediately to the emergency room.
>
> _____
>
> [4] [N.C.] was born [i]n October [], 2013.
>
> [5] [Quinones] also dropped off her three (3) year old daughter, J.H., born [i]n November [], 2010, at this day care facility as well. [Quinones] had been utilizing the services of Ms. Bermudez for approximately three (3) weeks prior to this date.
>
> _____
>
> As instructed by Ms. Bermudez, [Quinones] left work and came to retrieve [N.C.] to transport her to the Lehigh Valley Health Network Pediatric Clinic, an outpatient care facility located at 17th and Chew Streets, Allentown.[6] [Quinones] explained to the healthcare provider that the baby was not moving her left arm and that she was in pain and fussy. She stated that a box fan had fallen on the baby two (2) nights

before, but that the baby did not cry. [N.C.] was examined, and the doctor noted that her arm was swollen and deformed and that the baby was not moving it. Consequently, an x-ray of the baby's left arm was ordered.[7] The x-ray revealed an acute (0 to 3 days old) mid-shaft transverse fracture of the left humerus, and that the fracture was in a bone that was already starting to heal. As a result of the findings of this x-ray, [N.C.] was referred to the Emergency Room[8] to be hospitalized for a complete work up to determine if the baby was a victim of other previous trauma.

_____

[6] At the end of the day, the older daughter was retrieved by a member of [Quinones's] family.

[7] The x-ray included the humerus, radius, and ulna of the left arm.

[8] While in the ER, [Quinones] stated that a box fan fell on [N.C.] two (2) nights ago and that she cried for a few minutes until it resolved.

_____

A complete skeletal survey was performed. There was evidence that [N.C.] had suffered broken bones in the past, including: (1) a transverse fracture to the humerus that was about five (5) to six (6) weeks old. (This fracture would have required a lot of force to have occurred. A box fan falling on the baby's entire body one (1) month prior, as recounted by [Quinones], would have caused multiple injuries to the baby and not just one (1) isolated fracture. Also, a gentle step on the baby's arm when [Quinones] walked backwards from the kitchen would not have caused such a fracture as [Quinones] suggested. However, an adult-force "stomp" could have done it. This fracture would have caused the baby to cry immediately.); (2) a previous break to the left femur (thigh) that was 15 to 35 days old. (Symptoms would have been exhibited at the time of this event, which would have included crying, irritability, fussy, not using this limb. These symptoms would have been obvious to a caretaker.); (3) a previous broken right tibia (shin bone) that was 15 to 35 days old. (The force needed to [have caused] such a break would have been a wrenching or grabbing or shearing force, and the baby would have reacted immediately. Again, the symptoms would have been obvious to a caretaker); and (4) a previous broken left tibia (shin bone) that was 15 to 35 days old.

(The force needed to have caused such a break would have been a wrenching or grabbing or shearing force, and the baby would have reacted immediately. Again, the symptoms would have been obvious to a caretaker). After four (4) days of being in the hospital, [N.C.] was discharged to foster care on January 28, 2014.[9]

_____

[9] [N.C.] was taken for a follow up at the Lehigh Valley Health Network Pediatric Clinic for a repeat skeletal survey on February 20, 2014. No new fractures were noted or observed at that time. This finding was of interest to Dr. [Debra] Esernio-Jenssen, an expert in the field of pediatrics and child abuse pediatrics, as [N.C.] was now older and more mobile and at greater risk for injury. However, while in foster care, she did not suffer any new injury.

_____

Detective Melissa Gogel of the Special Victims' Unit of the Allentown Police Department received a referral from the Lehigh County Office of Children and Youth Services with regard to [N.C.] on January 24, 2014, concerning child abuse allegations. Consequently, on or before January 29, 2014, Detective Gogel interviewed [Quinones] at the Government Center in Allentown, Lehigh County, Pennsylvania. [Quinones] was informed by Detective Gogel that she was free to leave at any time. [Quinones] provided background information to Detective Gogel, such as that she moved from Florida approximately seven (7) months ago and was living with her step brother and sister-in-law at the Congress Apartments located [on] East Market Street, [] Allentown. [Quinones] related that she was a single mother and that she had just begun a new job three (3) weeks ago. As the primary caretaker[10] of her two (2) daughters, she needed to utilize Ms. Bermudez's day care once she obtained employment.

_____

10 Detective Gogel spoke with [Quinones's] stepbrother, Saire Castro, Jr., on January 31, 2014. He confirmed that [Quinones] was the primary caretaker of her two (2) daughters and that she took them everywhere with her because she did not trust others to watch her children. He also stated that [Quinones's] boyfriend did not live at the apartment, but that he was there most of the time.

- 4 -

[Quinones's] boyfriend, Ricardo Maldonado, also confirmed that [Quinones] never left her children alone.

_____

With regard to the multiple injuries on [N.C.], [Quinones] initially told Detective Gogel that at approximately 3:00 A.M. on January 24, 2014, a box fan had fallen into the "pack and play" in which [N.C.] was sleeping.[11] She stated that the baby cried, and that she grabbed the baby by both arms and pulled her to her.[12] [Quinones] related that she did not see any injuries on [N.C.], but the next morning she was fussy. When Detective Gogel confronted [Quinones] and stated that a box fan weighing less than two (2) pounds could not cause such injuries, [Quinones's] story evolved. [Quinones] then explained that when she was rushing to get ready for work,[13] the baby's arm got stuck in her pajama top while she was dressing [N.C.], and she roughly yanked it out. The baby cried, but [Quinones] thought that the baby was hungry.[14] This interview was not recorded.

_____

[11] [Quinones] indicated that although it was January, she used the box fan because it was hot at night.

[12] A later reenactment on January 29, 2014, of this event with [Quinones] demonstrated that the baby was almost entirely covered by the box fan that allegedly had fallen on her.

[13] [Quinones] stated that mornings typically are hectic and that she is always running late and having to rush around.

[14] [Quinones's] brother testified that on January 24, 2014, he heard the baby loudly crying that morning.

_____

Detective Gogel informed her partner, Detective John Buckwalter[15] of the Allentown Police Department, assigned to the Special Victims' Unit, that [N.C.] has suffered multiple fractures over the course of her short life. She further explained that [Quinones] only had an explanation for one (1) occurrence that began as a "box fan story" and morphed into an "arm pull" while changing [N.C.]'s clothing. Consequently, Detective Buckwalter conducted a second interview of [Quinones] on March 7, 2014, at the Government Center in Allentown. Again, this was a non-

custodial interview in which [Quinones] was advised that she was free to leave. During this interview, [Quinones] told Detective Buckwalter that when she was changing [N.C.] out of her pajamas, she heard and felt a "pop." [Quinones] adamantly informed Detective Buckwalter that she was the sole caretaker of her daughters, and never shifted blame to another individual. [Quinones] was cold and calm during the interview and was evasive when confronted with the fact that [N.C.] had suffered from multiple fractures on her arms and legs. Many of [Quinones's] answers included, "I don't know." However, [Quinones] did indicate that in the past a large cleaning bin that was packed with clothing and books was stacked in the bedroom and it fell and landed on [N.C.]'s leg. She was aware that [N.C.] was injured at that time, but she did not seek medical treatment because she thought that she could handle it herself. In addition, [Quinones] told Detective Buckwalter that one time when she was in the kitchen on the telephone, she backed up and stepped on [N.C.]'s arm while the baby was sleeping on the floor. Again, [Quinones] did not seek medical treatment because she thought that she could handle it herself. [Quinones] thought that perhaps this action caused a previous fracture. This interview was not recorded.

_____

[15] Detective Buckwalter was on vacation at the time of the initial interview with [Quinones]. Consequently, Detective Gogel had to brief Detective Buckwalter as to what transpired in the initial interview[.]

_____

Debra Esernio-Jenssen, M.D., Medical Director of the Child Protection Team for Lehigh Valley Health Network, was deemed by this Court to be an expert in the field of pediatrics and child abuse pediatrics without opposition by the defense. Dr. Esernio-Jenssen testified that [N.C.] had no complications or trauma at birth and that the configuration and density of her bones were normal. [N.C.]'s growth and development were normal. Dr. Esernio-Jenssen explained that a transverse fracture is a "through and through" fracture. This type of fracture can be caused by a three (3) part bending or a direct/chopping blow. Children's bones are harder to fracture because they are more elastic and can bend. They heal more quickly than adult bones. Consequently, it requires a tremendous amount of force to cause a transverse fracture in an infant. Dr. Esernio-Jenssen opined that the level of pain associated with such a fracture would be

the highest level of pain. Any movement of the bone would have caused pain and therefore the baby would not have moved the arm. The symptoms would have been immediate to the injury and the symptoms would have been obvious.

In addition, Dr. Esernio-Jenssen stated in her expert opinion that a plastic box fan falling on the infant would not have caused such an injury. However, Dr. Esernio-Jenssen opined that a forceful pull of the arm in which a related "pop" is heard would be consistent with a transverse fracture. Furthermore, if no treatment was sought for such a fracture, the lack of action could lead to permanent ill-effects. The concerns would be soft tissue injury, nerve injury, localized infection, and blood flow issues. Other long term effects could be the mal-union of the bone, fat embolism syndrome,[16] bone infection and the loss of function. In addition, a delay in treatment (which includes hours) could also cause the aforementioned risks, including life-threatening events such as bone infection, or permanent loss of function from long term nerve injury. Therefore, it was imperative to seek treatment without delay.[17]

_____

[16] A fat embolism is a blo[od] clot that could cause death.

[17] [Quinones] stated that she had concerns that [N.C.]'s three (3) year old sister, J.H., caused injuries to [N.C.] by dropping her. However, Dr. Esernio-Jenssen opined that a three (3) year old girl, weighing 29 pounds and 36 inches tall would have difficulty lifting her 12 pound sister. In addition, even if J.H. had been able to lift [N.C.] off the ground and dropped her, Dr. Esernio-Jenssen stated that the injuries suffered by [N.C.] are not consistent with this scenario. J.H. is short and therefore [N.C.] would have hit her hea[]d first. Also, Dr. Esernio-Jenssen noted that J.H. is not strong enough to yank a baby's arm with the required force to cause a transverse fracture. Rather, adult force, with strength and muscle mass, is necessary to fracture an infant's bone.

_____

Dr. Esernio-Jenssen opined to a reasonable degree of medical certainty that [N.C.] was a victim of physical abuse. Indeed, [N.C.] was only fifteen (15) weeks old at the time of the transverse fracture to her left humerus, and she was not mobile. A baby's bones have great elasticity and consequently significant

and repeated force is needed to cause a transverse fracture. Also, [N.C.] has normal bones as evidenced by the skeleton survey and blood tests, and there is no family history of any bone disorders in [N.C.]'s family. Finally, [N.C.] has not suffered any further injury while she has been in foster care.

Trial Court Opinion, 7/30/2015, at 4-10.

Quinones was initially charged with one count of EWOC. On March 30, 2015, she entered a guilty plea to that charge, in exchange for a minimum sentence of not more than 12 months' imprisonment. However, on May 13, 2015, at the scheduled sentencing hearing, Quinones withdrew her plea. Two days later, on May 15, 2015, the Commonwealth filed an amended information, charging Quinones with two counts of aggravated assault and one count of EWOC. Quinones filed a motion objecting to the amendment on May 28, 2015, asserting, *inter alia*, it violated an agreement her counsel made with the Commonwealth that if she waived her right to a preliminary hearing, the Commonwealth would not amend the charges to include aggravated assault. **See** Motion Objecting to the Commonwealth's Amended Information, 5/28/2015, at 1. She further claimed she waived her right to a preliminary hearing in reliance on this agreement. The trial court subsequently denied Quinones's objection.[2] On June 1, 2015, the court also entered an order granting a Commonwealth motion in *limine* to preclude

_____

[2] Quinones also filed a motion in *limine* requesting the court exclude any statements she made during the entry of her guilty plea. **See** Motion in Limine, 6/1/2015. The trial court granted that motion on June 1, 2015.

Quinones's parents "from offering character evidence, as the defense has failed to articulate why proper character evidence should be permitted in this case."[3]  Order, 6/1/2015.

The case proceeded to a jury trial.  On June 3, 2015, the jury returned a verdict of guilty on all charges.  On July 10, 2015, the trial court sentenced Quinones to a term of five to 10 years' imprisonment on one count of aggravated assault, and a consecutive term of three and one-half to seven years' imprisonment on the charge of EWOC.  The second count of aggravated assault merged for sentencing purposes.  On July 20, 2015, Quinones filed a post-sentence motion, which the trial court denied on July 29, 2015.  This timely appeal followed.[4]

_____

[3] The record does not contain a written motion filed by the Commonwealth, nor do the notes of testimony from June 1, 2015, reflect an oral motion in *limine*.  Moreover, Quinones's response similarly was not recorded.

[4] On August 31, 2015 (docketed September 1, 2015), the trial court ordered Quinones to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Quinones complied with the court's directive and filed a concise statement on September 25, 2015.  The trial court entered an order on September 29, 2015, stating that its July 30, 2015, opinion in support of its order denying Quinones's post-sentence motions was dispositive of the issues raised on appeal.

Thereafter, on April 29, 2016, Quinones filed a motion in this Court seeking to vacate the briefing schedule and remand for the filing of a supplemental concise statement.  **See** Motion to Vacate Briefing Schedule and Remand to the Court Below, 4/29/2016.  Specifically, appellate counsel averred that some of the relevant transcripts were unavailable at the time trial counsel filed the original concise statement, and trial counsel failed to include certain issues in the concise statement.  **See id.**  On May 17, 2016, this Court, by *per curiam* order, granted Quinones's application.  Thereafter, *(Footnote Continued Next Page)*

In her first issue on appeal, Quinones argues the Commonwealth breached a pretrial agreement that it would proceed only on a charge of EWOC if Quinones waived her right to a preliminary hearing. *See* Quinones's Brief at 25. As she candidly admits, "Pennsylvania Courts have not addressed the enforceability of agreements regarding waivers of preliminary hearings." *Id.* at 26. Accordingly, Quinones urges this Court to look to case law regarding the enforceability of guilty plea agreements, and maintains the Commonwealth should be bound by its promise. *See id.* ("An executed pre-trial agreement stands on equal footing. Valid agreements, once executed and accepted by a court are binding."). Although Quinones recognizes the agreement is not memorialized in the record, she contends "the record reflects sufficient evidence to establish the existence of the agreement" and the Commonwealth's subsequent breach after she withdrew her guilty plea, "strongly suggests a motive of retribution." *Id.* at 29, 30. Lastly, Quinones insists that if she "had believed the Commonwealth would have breached, she would not have withdrawn her plea." *Id.* at 30-31. Consequently, she requests this Court dismiss the aggravated assault charges. *See id.* at 31.

---

*(Footnote Continued)*

counsel filed a supplemental concise statement on July 8, 2016, and the trial court filed a supplemental opinion on July 18, 2016.

Preliminarily, we note the Commonwealth contends the particular issue raised on appeal is waived. **See** Commonwealth's Brief at 14-15. We are constrained to agree.

In her motion objecting to the Commonwealth's amended information, Quinones argued the Commonwealth never sought the trial court's permission before filing an amended information pursuant to Pa.R.Crim.P. 564, and added the new charges "with the purpose of keeping [Quinones] and her counsel from focusing on the present original charge" of EWOC. Motion Objecting to the Commonwealth's Amended Information, 5/28/2015, at 2-3. On appeal, however, Quinones contends the Commonwealth breached a purported agreement that if Quinones waived her right to a preliminary hearing, the Commonwealth would not amend the information to include charges of aggravated assault.[5] **See** Quinones's Brief at 25. Because trial counsel failed to raise this specific claim in his objection before the trial court, we find it is waived on appeal.[6] **See** Pa.R.A.P. 302(a)

---

[5] We note, too, that this "agreement" does not appear anywhere in the certified record. However, in its brief, the Commonwealth appears to endorse Quinones's contention that the parties did enter into such an agreement before the preliminary hearing. **See** Commonwealth's Brief at 16.

[6] We note the trial court did not address the purported agreement in its opinion. Rather, it focused on Quinones's argument that the Commonwealth failed to seek court approval before amending the criminal complaint. **See** Trial Court Opinion, 7/30/2015, at 20-21.

("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Nevertheless, we note that even if Quinones had preserved this issue for appeal, we would conclude she is entitled to no relief. Indeed, Quinones's argument ignores Pennsylvania Rule of Criminal Procedure 541, which provides, in relevant part:

> (A) The defendant who is represented by counsel may waive the preliminary hearing at the preliminary arraignment or at any time thereafter.
>
> * * * *
>
> (2) If the defendant waives the preliminary hearing by way of an agreement, made in writing or on the record, and the agreement is not accomplished, the defendant may challenge the sufficiency of the Commonwealth's *prima facie* case.

Pa.R.Crim.P. 541(A)(2).

Here, Quinones maintains she waived her right to a preliminary hearing based upon the Commonwealth's agreement that it would not pursue charges of aggravated assault. However, after she withdrew her initial guilty plea, the Commonwealth filed an amended information which included two counts of aggravated assault. At that time, if Quinones believed the Commonwealth had breached its agreement, her remedy would have been to demand a preliminary hearing on the amended charges pursuant to Pa.R.Crim.P. 541(A)(2). She declined to do so. **See Commonwealth v. Murray**, 502 A.2d 624, 630 (Pa. Super. 1985) ("Logically, a new preliminary hearing is foolish once the evidentiary trial is

completed without reversible error."), *appeal denied*, 523 A.2d 1131 (Pa. 1987).

Furthermore, we reject Quinones's contention that the appropriate remedy at this time would be to discharge her convictions of aggravated assault. While Quinones attempts to compare her pre-trial agreement waiving a preliminary hearing to a pre-trial guilty plea agreement, we find the analogy lacking. Indeed, "the purpose of a preliminary hearing in a court case is not to decide guilt or innocence; but rather to determine whether the Commonwealth has presented a prima facie case which is legally sufficient to hold the accused for court." **Commonwealth v. Rogers**, 610 A.2d 970, 972 (Pa. Super. 1992). While Quinones was deprived of her opportunity to challenge the Commonwealth's *prima facie* case **before** trial, she was later found guilty of those charges, beyond a reasonable doubt, by a jury. **See Murray**, **supra**. Accordingly, she is entitled to no relief.

Next, Quinones challenges the sufficiency of the evidence supporting her conviction of aggravated assault under Subsection 2702(a)(9), causing serious bodily injury to a child less than 13 years old.[7] **See** 18 Pa.C.S. §

---

[7] We note Quinones does **not** challenge her conviction of aggravated assault under Subsection 2702(a)(8), which states that a person is guilty of aggravated assault if she "attempts to cause or intentionally, knowingly or recklessly causes **bodily injury** to a child less than six years of age, by a person 18 years of age or older[.]" 18 Pa.C.S. § 2702(a)(8) (emphasis added). Accordingly, she implicitly concedes the evidence was sufficient to
*(Footnote Continued Next Page)*

2702(a)(9). Specifically, Quinones asserts the Commonwealth conceded that she did not intend to cause serious bodily injury to N.C., and the evidence did not support a finding that N.C. actually suffered serious bodily injury as defined in the Pennsylvania Crimes Code. **See** Quinones' Brief at 32-35.

Our review of a challenge to the sufficiency of the evidence is guided by the following:

> There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden "by means of wholly circumstantial evidence." Further, we note that the entire trial record is evaluated and all evidence received against the defendant is considered, being cognizant that the trier of fact is free to believe all, part, or none of the evidence.

**Commonwealth v. Martin**, 101 A.3d 706, 718 (Pa. 2014) (internal citation omitted), *cert. denied*, 136 S. Ct. 201 (U.S. 2015).

Subsection 2702(a)(9) of the aggravated assault statute provides that a person is guilty of aggravated assault if she "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older." 18 Pa.C.S.

*(Footnote Continued)* ───────────────

establish she inflicted "bodily injury" on her daughter. **See** 18 Pa.C.S. § 2301 (defining "bodily injury" as "[i]mpairment of physical condition or substantial pain").

§ 2709(a)(9).  Here, Quinones maintains the Commonwealth conceded that she did not intend to harm her child.[8]  **See** Quinones's Brief at 32. Moreover, Quinones does not dispute the evidence was sufficient to establish she acted knowingly or recklessly.  Rather, her sole claim on appeal is that the evidence was insufficient to support the jury's determination that N.C. suffered "serious bodily injury."  **Id.** at 33.

> The Crimes Code defines "serious bodily injury" as:
>
> Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

18 Pa.C.S. § 2301.  Quinones argues the "various fractures" N.C. sustained did not rise to the level of serious bodily injury.  Quinones's Brief at 33. Rather, she asserts the evidence established N.C. suffered only "bodily

---

[8] We note the Commonwealth indicated, during closing argument that Quinones "didn't intend to cause this fracture."  N.T., 6/3/2015, at 174. However, the trial court later charged the jury on **both causing** serious bodily injury and **attempting to cause** serious bodily injury, and Quinones did not object to the charge.  **See id.** at 196. ("To find the defendant guilty of this offense you must find that … the defendant **caused or attempted to cause** serious bodily injury to [N.H.]." (emphasis added); **id.** at 200. Therefore, based on the court's instructions, the jury could have found Quinones guilty either because she caused serious bodily injury to N.H., **or** she attempted to do so, although no serious bodily injury resulted.  **See** N.T., 6/3/2015, at 207-208 (trial court explaining the discrepancy to counsel and noting this might have caused "some confusion to the jury"). Nevertheless, because we conclude the evidence was sufficient to establish N.C. suffered serious bodily injury, we need not consider whether evidence also established that Quinones **attempted** to cause serious bodily injury to N.C.

injury" which is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. Quinones maintains:

> Although counter-intuitive, the fact that a broken bone occurs in a child so young makes the injury less severe than the same break in an adult. Adults heal much more slowly. … Dr. [Esernio-]Jenssen's testimony establishes bodily injury only, nothing more. N.C. suffered no permanent injury. She did not face a substantial risk of death and at most each fracture resulted impairment for no more than a week, and possibly as long as four days (N.T. 6/2/2015 at 56) (broken limbs in infants can heal without noticeable impairment [] "within four to seven days"). Dr. [Esernio-]Je[n]ssen also testified N.C. was "fine" within a month after being removed from Quinones's care (N.T. 6/2/2015 at 35-36, 66). This included the fractures which were not immediately diagnosed as they healed quickly and well on their own. N.C. experienced substantial pain, but substantial pain for a short while and then some immobility for several days is not serious injury, resulting in a felony one grading.
>
> Dr. [Esernio-]Jenssen's testimony regarding N.C.'s injuries aligns neatly with the definition of bodily injury, not [serious bodily injury]. There is no doubt the jury was swayed by the horrors of child abuse and the need to avenge the pain caused to a child. This emotional reaction, while understandable, has little place in defining our crimes and what constitute a first degree felony.[9]

Quinones' Brief at 34-35.

In concluding the evidence was sufficient to establish N.C. suffered "serious bodily injury," the trial court opined:

> On January 24, 2014, [N.C.] suffered a transverse fracture of her left humerus. The force necessary to inflict such a fracture on this infant was tremendous due to the elasticity of her infant

_____

[9] We note that Quinones's conviction of aggravated assault under Subsection 2702(a)(8), which she does not challenge on appeal, is graded as a second degree felony. 18 Pa.C.S. § 2702(b).

bones. Also, the pain associated with a transverse fracture would have been at the highest level of pain and the baby would not have been able to move her arm while in a fractured state. If no treatment was sought for such a fracture, the lack of action could lead to permanent ill-effects. The concerns would be a soft tissue injury, nerve injury, localized infection, and blood flow issues. Other long term effects could be the mal-union of the bone, fat embolism syndrome which could be fatal, bone infection which could be fatal and loss of function. In addition, a delay in treatment (which includes hours) could also cause and/or increase the likelihood of the aforementioned risks, including life-threatening events such as bone infection, or permanent loss of function from long term nerve injury. Therefore, it was imperative to seek treatment without delay.

Trial Court Opinion, 7/30/2015, at 18-19.

Our review of the record reveals ample support for the jury's verdict. Quinones focuses on Dr. Esernio-Jenssen's testimony that a broken limb in an infant can heal within "four to seven days." Quinones's Brief at 34. She argues, therefore, that N.C. did not "face a substantial risk of death" or prolonged impairment sufficient to support a finding that the child suffered "serious bodily injury." *Id.* However, we find Quinones has misconstrued the doctor's testimony.

Dr. Esernio-Jenssen explained that the "through-and-through" transverse fracture in N.C.'s humerus was a "significant fracture" and required a "tremendous amount of force" due to the elasticity of the infant's bones. N.T., 6/2/2015, at 30. She further testified that after the injury, N.C. "would not be moving that part of [her] arm at all … because any kind of motion … would be very painful." *Id.* at 31. Moreover, contrary to Quinones's characterization, Dr. Esernio-Jenssen did not testify that N.C.'s

numerous fractures each healed in less than a week. Rather, she explained that as "new bone starts being laid down," which can occur in four to seven days, the infant "could **appear** completely normal" since the acute pain would have subsided.[10] *Id.* at 56 (emphasis added). She did not testify, however, that the fracture would have completely healed at that time. Indeed, N.C. was hospitalized for four days following diagnosis of the transverse fracture which precipitated the investigation herein. *See id.* at 81. Accordingly, we conclude the evidence was sufficient for the jury to find N.C., who experienced at least five significant bone fractures between the time she was two months old and four months old,[11] suffered from a

---

[10] This could explain why the physicians who examined N.C. in the emergency room on December 21, 2013, and at the doctor's office on January 9, 2014, found no signs of the prior fractures. Dr. Esernio-Jenssen testified:

> [I]f a caregiver is not providing a history that, "I'm concerned my baby is not moving her left leg or her left arm," a medical professional is just examining a situation routinely, not likely palpating every single bone, but looking overall at the body of an infant.

*Id.* at 56-57. Indeed, N.C. was diagnosed with oral thrush during the December 2013 emergency room visit, and the January 9, 2014, office visit was a follow-up for that diagnosis. *See id.* at 21; N.T., 6/3/2015, at 15. Therefore, those two examinations were not focused on the victim's musculoskeletal system.

[11] Dr. Esernio-Jenssen testified all of the injuries occurred between December 10, 2013, and January 24, 2014. *See* N.T., 6/2/2015, at 77-79. Moreover, she stated the pediatric radiologist who had reviewed N.C.'s skeletal survey with her was "pretty confident" the infant had suffered three additional fractures during the same time frame. *Id.* at 90.

"protracted loss or impairment of the function of [a] bodily member," namely her arms and legs. 18 Pa.C.S. § 2301.

In her penultimate claim, Quinones contends the trial court erred in granting the Commonwealth's motion in *limine* precluding her from offering reputation evidence that she was a "good and careful parent." Quinones's Brief at 35. She emphasizes that evidence of a defendant's good character may, alone, establish reasonable doubt, and the court's failure to allow her parents to testify regarding her reputation as a good parent was reversible error. ***See id.*** at 36-38.

Our standard of review is well-settled:

When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. ***Commonwealth v. Bozyk***, 987 A.2d 753, 755–756 (Pa.Super.2009) (quoting ***Commonwealth v. Owens***, 929 A.2d 1187, 1190 (Pa.Super.2007)). The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal "unless that ruling reflects 'manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'" ***Id.*** (quoting ***Commonwealth v. Einhorn***, 911 A.2d 960, 972 (Pa.Super.2006)).

***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa. Super. 2010).

Preliminarily, we must bear in mind:

Evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all the evidence presented in the case on the general issue of guilt or innocence.

*Commonwealth v. Harris*, 785 A.2d 998, 1000 (Pa. Super. 2001), *appeal denied*, 847 A.2d 1279 (Pa. 2004). Indeed, this Court has acknowledged good character evidence "is so important that failure to present available character witnesses may constitute ineffective assistance of counsel if there is no reasonable basis for such failure." *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1264 (Pa. Super. 2014) (*en banc*), *appeal denied*, 104 A.3d 1 (Pa. 2014).

Pennsylvania Rule of Evidence 404 permits a defendant to offer evidence at trial of a "pertinent trait." Pa.R.E. 404(a)(2)(A). "[O]ur Supreme Court has interpreted the term 'pertinent' to refer to a character trait that is relevant to the crime charged against the accused." *Minich*, *supra*, 4 A.3d at 1071. Recently, this Court acknowledged that testimony regarding a defendant's reputation as a "good father" was permissible character evidence "pertinent to rebut a charge that the [defendant] abused children under his care" when he was charged with EWOC. *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 782 n.6 (Pa. Super. 2015), *appeal denied*, 123 A.3d 331 (Pa. 2015).

However, Pennsylvania Rule of Evidence 405 clarifies that evidence of a pertinent character trait may be proven only "by testimony about the person's reputation." Pa.R.E. 405(a). Neither testimony regarding a witness's personal opinion that the defendant possesses a certain character trait, nor specific instances of the defendant's conduct relevant to that trait, is admissible to establish a defendant's good character. Pa.R.E. 405(a), (b).

- 20 -

The trial court explained the basis for its ruling precluding Quinones's character evidence as follows:

> [Quinones] intended to call her mother and father to offer character evidence purporting that [Quinones] is a good mother and that they have never seen [her] act negligently towards her daughter, [N.C.] After argument in which [Quinones] failed to articulate why such character evidence should be permitted in this case, this Court found this evidence not to be admissible. Indeed, this Court concluded that it was improper character evidence offered for the purpose of suggesting that [Quinones] could not have committed the offenses with which she was charged. This Court notes that evidence of a defendant's good moral character must be made through reputation evidence. This is because "character evidence is not the opinion of one person or even a handful of persons, but must represent the consensus of the community." Commonwealth v. Keaton, 615 Pa. 675, 715, 45 A.3d 1050, 1074 (Pa. 2012). As such, the witnesses' personal opinions based on specific incidents of good conduct are improper character evidence because they do not represent the consensus of the community. This Court concluded that testimony alleging that the witness saw [Quinones] being a good mother on certain occasions was improper evidence to prove that [Quinones] acted in conformity therewith on other occasions. Consequently, [Quinones's] mother and father were properly precluded from offering character evidence, but were permitted by this Court to testify as fact witnesses for the defense.

Trial Court Opinion, 7/30/2015, at 15-16.

We detect no abuse of discretion on the part of the trial court. As Quinones candidly admits, "no record exists of any motion being made, the grounds for the objection, the offer of proof presented, or the ruling being placed on the record other than the one sentence order." Quinones's Brief at 35 n.6. While she recognizes "trial counsel had a duty to make an offer of proof to preserve the claim for appeal[,]" Quinones insists that "it should be

apparent that [her] parents … would be capable of testifying to her reputation as a parent." *Id.*  Indeed, she points to the trial testimony of her father that he frequented her home while other people were present to support her claim that he could have testified to her reputation as a good mother. *See id.* at 36.

We find no relief is warranted.  It was Quinones's duty to establish the admissibility and relevancy of her proposed character evidence. *See* Pa.R.E. 103(a)(2).  The trial court found Quinones failed to do so, in that her offer of proof consisted only of "the witnesses' personal opinions [of Quinones's good character] based on specific instances of good conduct[.]"  Trial Court Opinion, 7/30/2015, at 16.  As noted above, the only permissible character testimony would have been concerning Quinones's reputation in the community as a good mother.  We have no reason to question the court's representation of Quinones's deficient offer of proof.  Further, we decline to presume, as Quinones requests, that either of her parents could have testified regarding her good reputation in the community.  Accordingly, Quinones's third issue fails.

Lastly, Quinones challenges the discretionary aspects of her sentence.  Specifically, she argues the trial court imposed a sentence (1) outside the guidelines range without providing sufficient reasons on the record, and (2) which is manifestly excessive and violates the Sentencing Code. *See* Quinones's Brief at 39, 41-42.

A challenge to the discretionary aspects of a sentence is not absolute, but rather, "must be considered a petition for permission to appeal." ***Commonwealth v. Best***, 120 A.3d 329, 348 (Pa. Super. 2015) (quotation omitted). To reach the merits of a discretionary issue, this Court must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved [the] issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

***Commonwealth v. Edwards***, 71 A.3d 323, 329-330 (Pa. Super. 2013) (citation omitted), *appeal denied*, 81 A.3d 75 (Pa. 2013).

Quinones complied with the procedural requirements for this appeal by filing a timely post-sentence motion seeking modification of her sentence, and a subsequent notice of appeal, and by including in her appellate brief a statement of reasons relied upon for appeal pursuant to ***Commonwealth v. Tuladziecki***, 522 A.2d 17 (Pa. 1987), and Pa.R.A.P. 2119(f). Therefore, we must determine whether she has raised a substantial question justifying our review.

A defendant raises a substantial question when she "advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Commonwealth v. Proctor***, 156 A.3d 261, 273 (Pa. Super. 2017)

(quotation omitted). A claim that the trial court imposed a sentence outside the guideline range without providing sufficient reasons on the record raises a substantial question for our review. *See id.* Furthermore, an allegation that the resulting sentence was unreasonable also raises a substantial question that the sentence violates a specific provision of the Sentencing Code. *See* 42 Pa.C.S. § 9781(c)(3). Accordingly, we will proceed to an evaluation of Quinones's claims on appeal.

We begin by emphasizing "the proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion." *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007).

> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

*Id.* at 961-962 (internal citations and footnote omitted).

Accordingly, the sentencing guidelines are merely advisory, and a trial court has the discretion to impose a sentence in excess of the guideline

ranges. *See Commonwealth v. Bowen*, 55 A.3d 1254, 1264 (Pa. Super. 2012), *appeal denied*, 64 A.3d 630 (Pa. 2013). However, when the court does so, it "must provide in open court a contemporaneous statement of reasons in support of its sentence." *Id.* *See* 42 Pa.C.S. § 9721 (when imposing an appropriate sentence, a court must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant."). Indeed,

> [Section 9721] requires a trial judge who intends to sentence a defendant outside of the guidelines to demonstrate on the record, as a proper starting point, [its] awareness of the sentencing guidelines. Having done so, the sentencing court may deviate from the guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community, so long as [it] also states of record the factual basis and specific reasons which compelled [it] to deviate from the guideline range.

*Id.* (quotation omitted).

Furthermore, Section 9781 of the Sentencing Code provides that an appellate court must vacate a sentence, and remand for resentencing, if it finds "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." 42 Pa.C.S. § 9781(c)(3). In making this determination, the appellate court must consider:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d). "When a sentencing court has reviewed a presentence investigation report ["PSI"], we presume that the court properly considered and weighed all relevant factors in fashioning the defendant's sentence." *Commonwealth v. Baker*, 72 A.3d 652, 663 (Pa. Super. 2013), *appeal denied*, 86 A.3d 231 (Pa. 2014).

Quinones first asserts the trial court failed to provide adequate reasons on the record for imposing a sentence outside the guidelines range. We note our review of the record reveals no mention of the applicable standard guideline ranges for Quinones's crimes. However, the court did state during the sentencing hearing that the sentences imposed were "in and actually beyond the aggravated range" of the guidelines. N.T., 7/10/2015. To that end, Quinones states in her brief that the standard range for her conviction of EWOC was three to 12 months' imprisonment. *See* Quinones's Brief at 38. Accordingly, she maintains the sentence imposed for that crime, three and one-half to seven years, was more than triple the standard range.[12] *See id.*

_____

[12] Based on the court's comment at sentencing, we infer the sentence for aggravated assault was within the aggravated range of the guidelines. We also note both sentences were within the statutory maximum limits. *See* 18 Pa.C.S. § 1103 (statutory maximum for first degree felony is not more than 20 years, and for third degree felony is not more than seven years).

Here, the trial court was clearly aware of the guideline ranges since it had the benefit of a PSI, and acknowledged, during the sentencing hearing, that one of the sentences imposed was "beyond the aggravated range." N.T., 7/10/2015, at 33. The court also stated that it was imposing a sentence outside of the guidelines "as a result of the defendant being in the position of the mother of the victim; that the child was not only under the age according to the statute but was 15 weeks old and suffered repeated injuries, not just this one incident[; and t]he defendant is a danger to her children." *Id.*

Quinones contends this reasoning is insufficient because the factors the trial court relied upon to "justify its enhancement are necessary elements of EWOC and typical in many cases." Quinones's Brief at 41. *See* 18 Pa.C.S. § 4304(a)(1) ("A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support."). Indeed, the fact that the defendant is the child's mother is required by the statute. Further, Quinones asserts the fact that the victim suffered "repeated injuries" was already considered by the court when it graded the offense as a felony of the third degree. *See* 18 Pa.C.S. § 4304(b) ("[W]here there is a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree."). Furthermore, Quinones emphasizes her children have been removed from her care, so that it is

unclear how she could be a danger to them. Therefore, she argues the court's stated considerations "cannot support the sentence." Quinones's Brief at 41.

Our review of the entire transcript from the sentencing hearing reveals the trial court provided sufficient reasons for its imposition of a sentence outside the guidelines range for the conviction of EWOC. Indeed, the court made the following statement immediately before announcing its sentence:

> Obviously, cases dealing with trauma to children are very serious and are very, very disturbing.
>
> I don't think that when you gave birth that it was in your mind that you were going to start beating your child. However, that's what happened. I shouldn't say beating. I should say breaking her bones.
>
> And this is a baby who was born completely normal, no trauma, no injuries, no trauma from birth. Everything was rosy for her future, with one exception. She was born to you. And you were, in my opinion, overwhelmed with having two children, trying to work.
>
> I don't believe for a second that your boyfriend caused any of those injuries and that is the beauty of a trial, because you get to see people come up here and testify. And the jury gets to decide who they believe and who they don't believe. And they believed your boyfriend. And he came across as credible.
>
> You came across as a liar. Almost everything you said on the witness stand about what happened to your baby was contradicted by credible medical experts. Every three weeks, as I calculated it, there was another broken bone.
>
> For 15 weeks that that child was with you, her life was a nightmare.
>
> To believe that she was some giggly, bubbly baby is ridiculous. The medical evidence was that the pain was of the highest level. That means screaming. That means an inability to move these limbs. That means that for 15 weeks of that

child's life she was in almost constant pain. So you live with that.

And you want to come in here and talk to me about how I need to worry about the baby that you are now carrying.[13] That was your choice. So I don't factor that in at all. It has nothing to do with your sentencing.

The baby was swollen and deformed from these injuries every time there was a break. There were both shins that were broken, the femur, the arm, twice. No one threatened you. That's not true.

This letter that you wrote after you were convicted is eight pages of nonsense. Nonsense.

Your own brother said that you were the only one that ever cared for that baby. …

The transverse fracture, the one that she's showing you the picture of, that is a through and through complete break.

Baby's bones are flexible. They bend. They bounce, pretty much. The amount of force that is required to do a transverse fracture is significant. And that was done on your own baby by you.

The rest of your family, that's their job. I take no issue with the family supporting her. That's what you do. But don't be fooled. The facts are what they are.

N.T., 7/10/2015, at 30-32.

Accordingly, it is evident from the court's comments during the hearing that the trial court considered the unique facts of this case when it imposed a sentence outside the guidelines range for EWOC. Although the statute requires that the defendant be "[a] parent, guardian or other person

_____

[13] Quinones was pregnant with a third child at the time of the sentencing hearing.

supervising the welfare of a child under 18 years of age,"[14] here, the court emphasized Quinones was the mother of the very young victim, who was only between two and four months old when she suffered numerous broken bones at the hands of the defendant.

Moreover, while the court did already consider the fact that there was "a course of conduct of endangering the welfare of a child" when it graded the crime as a third-degree felony, again, the question is one of degree. 18 Pa.C.S. § 4304(b). Indeed, placing one's child in a situation in which the child **might be** injured, is different than repeatedly breaking the bones of a baby. Accordingly, we conclude the trial court provided sufficient reasons for imposing a sentence above the aggravated range for EWOC.

Quinones also contends, however, that the aggregate sentence imposed by the trial court was unreasonable. Again, we disagree. As the court explained above, Quinones caused N.C. to suffer at least five broken bones when the child was between two and four months' old. The court credited the expert testimony of Dr. Esernio-Jenssen, who testified the infant's pain would have been at the "highest level," and noted that Quinones's testimony describing N.H. as "some giggly, bubbly baby is ridiculous." N.T., 7/10/2015, at 31. The court further stated its belief that Quinones was a liar, evidenced by her attempt to shift the blame for the

---

[14] 18 Pa.C.S. § 4304(a)(1).

child's injuries to her then boyfriend. **See id.** at 30. Moreover, even after her conviction, Quinones refused to take responsibility for her actions, stating only, "I really do wish I would have took [sic] her to the hospital right away." **Id.** at 20. Accordingly, considering the factors listed in Section 9781(d) – including the fact that the baby suffered at least five broken bones before she was four months old and the trial court's explicit finding that Quinones lied during her testimony – we cannot conclude the sentence imposed, although harsh, was either an abuse of discretion or unreasonable under the circumstances.

Judgment of sentence affirmed.

Lazarus, J., joins in this decision.

Fitzgerald, J., concurs in the result.

*Judgment Entered.*

_____

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: _9/26/2017_